UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
            :

UNITED STATES OF AMERICA     :

            :   25-CR-563 (LAP)

      -v-       :

            :

LUIS LOUIS         :

            :

            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR ALTERNATIVELY FOR AN ADVERSE JURY INSTRUCTION**

1

**TABLE OF CONTENTS**

I.      Introduction…………………………………….………………………………...…..4

II.     Background…………………………………………………….…………….…………5

III.    Law & Analysis…………………………………………….…………….……….8

        a.  The Court should Dismiss the Indictment or Alternatively Provide an Adverse Jury
            Instruction Due to the Government's Failure to Preserve Exculpatory Evidence ….…..8

        b.  The Court should Dismiss the Indictment because the Second Amendment Protects Mr.
            Louis' Right to Possess a Firearm……………………………….………………………16

IV.     Conclusion……………………………….…………………………………....……….17

## TABLE OF AUTHORITIES

*Dorchester Financial Holdings Corp. v. Banco BRJ S.A.*,

304 F.R.D. 178 (S.D.N.Y. 2014)……………………...………………………………16

*Gaston v. Hazeltine*,

2023 WL 3276001 (N.D. Ind. May 4, 2023)……………………...………….…………10

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*,

552 F.3d 93 (2d Cir. 2008)…………………………………………...…………….8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,

142 S. Ct. 2111 (2022)………………………………………………….………….4

*Taylor v. City of New York*,

293 F.R.D. 601 (S.D.N.Y. 2013)…………………………………………...……….12

*Tchatat v. O'Hara*,

249 F. Supp. 3d 701 (S.D.N.Y. 2017)…………………………………………….8, 9

*United States v. Albarran*,

943 F.3d 106 (2d Cir. 2019)…………………………………………..……….10

*United States v. Cesiro*,

2024 WL 4647667 (2d Cir. Nov. 1, 2024)…………………………………...14, 15

*United States v. Prawl*,

149 F. 4th 176 (2d Cir. 2025)…………………………………………...…………….11

*United States v. Rahman*,

189 F.3d 88 (2d Cir. 1999)……………………………………..……………...8, 9

*United States v. Soriano*,

401 F. Supp. 3d 396 (E.D.N.Y. 2019)…………………………….………….…14, 16

*United States v. Walker*,

974 F.3d 193 (2d Cir. 2020)………………………………………..…….…9, 10, 11, 14

*Zherka v. Bondi*,

140 F.4th 68 (2d Cir. 2025)………………………………………….……………16

## I.    Introduction

The government's case against Luis Louis is built entirely on circumstantial evidence. Despite being charged with one count of possessing a firearm after a felony conviction, Mr. Louis was never arrested with a gun, was never seen carrying a gun, and there has been no evidence produced to suggest that his fingerprints or DNA were found on any of the guns that he is accused of possessing. Instead, the government will ask a jury to convict Mr. Louis on the basis of several short clips from video surveillance footage that show him -- over the course of two weeks -- entering and exiting an apartment where firearms were later found. The problem with the government's evidence, however, is that it is wholly incomplete.

Critically, the government failed to preserve other relevant video surveillance footage, even though it was on notice that there were individuals besides Mr. Louis who had been inside that apartment, and who had accessed that apartment independently of him during this same two-week window. This surveillance footage, which is now destroyed, would have established that individuals other than Mr. Louis went in and out of that apartment, shed light on who carried those firearms into the apartment and, in the process, absolved Mr. Louis of criminal responsibility. Because the government has no justification for its decision not to preserve this exculpatory evidence, the Court should dismiss the indictment or alternatively commit to providing an adverse jury instruction at trial.

Separately, the Court should dismiss the indictment following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which held that gun regulations burdening Second Amendment protections are presumptively unconstitutional unless the government can carry its burden of establishing that the challenged regulation is "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Because the

government cannot meet that burden with respect to § 922(g)(1), and as applied to Mr. Louis, this Court must dismiss the indictment as violative of Mr. Louis' Second Amendment protections.

## II.    Background

On October 10, 2025, at around 2:00pm, officers from the NYPD were called to investigate an apparent burglary at an apartment building located at 1670 Townsend Avenue, Bronx, NY 10453.  When officers arrived, the building's superintendent explained that an individual identified as "Louis" had broken into a particular unoccupied apartment in the building, had changed the locks without permission, and appeared to be using the apartment to store his personal belongings.

While on site, the superintendent took the officers to apartment #4G and opened the door with a key.  It thus appears that, prior to the officers arriving on scene, the superintendent had accessed the apartment with a locksmith and changed the locks back.[1]  Inside that apartment, officers found approximately 10 firearms, along with ammunition.  While the officers were inside the apartment, an individual, that the superintendent alleged to be "Louis," approached the apartment and, upon seeing it occupied by officers, fled.  Officers were not able to apprehend this individual.

During their subsequent investigation, law enforcement obtained video surveillance footage from outside apartment #4G, which the government turned over in discovery.  The footage that the government provided in discovery, however, only includes approximately 24 short video clips, none of which exceed 30 seconds in length.  The clips span the time period of September 27, 2025 through October 10, 2025, and show Mr. Louis at various times entering and exiting

---

[1] This was confirmed on officer bodycam footage.

apartment # 4G.  In none of the clips is Mr. Louis seen carrying a firearm or carrying a duffel bag resembling the one in which several of the firearms were later found.



Critically, the government's production of video surveillance footage is largely incomplete. Despite being on notice that multiple individuals other than Mr. Louis had accessed this apartment before officers found firearms inside, the government did not preserve key surveillance footage from the relevant time period.  For example, there is no video footage of the building superintendent accessing apartment #4G with a locksmith prior to the officers arriving on scene. There is no video showing the individual alleged to be "Louis" fleeing from apartment #4G.  And while the government produced a video clip from October 3, 2025, which shows an individual other than Mr. Louis leaving the apartment with several duffel bags in his hands, the government produced no video footage of that individual entering the apartment at an earlier point in time (see below image).



On December 3, 2025, Mr. Louis was arrested and charged in the Southern District of New York with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Undersigned counsel was appointed to represent Mr. Louis that same day.  On February 26, 2026, after concluding the discovery review in this case, undersigned counsel contacted the government to inquire about whether it had retained the full surveillance footage from September 27, 2025 through October 10, 2025.  The government responded that it did not have any additional footage in its possession and represented that the apartment building's video surveillance system did not capture and save continuous footage; rather, it only detected and captured motion.  In other words, the government suggested that no additional saved footage ever existed.

Following the government's representations, an investigator from the Federal Defenders of New York contacted the apartment building's property management company and spoke with Chief Operating Officer Amir Barkhordar, who contradicted the government's understanding about the building's video surveillance system.  In a sworn affirmation, Mr. Barkhordar represented that the video surveillance system at this property captures and saves continuous footage 24 hours per day, even where motion is not detected; that all video surveillance footage at this property is stored and saved for a period of 30 days, after which it is no longer retained; and that the video surveillance footage for this property from the period of September 27, 2025 through

October 10, 2025 is no longer available.  *See* Exhibit 1 (Amir Barkhordar Sworn Affirmation).

The takeaway from Mr. Barkhordar's affirmation is that the full video surveillance footage did

exist at one time and was thus available to the government for preservation.  Instead, it appears

that the government preserved only a select few clips from the overall footage.

Here, in light of the fact that the government had knowledge that individuals other than

Mr. Louis accessed the apartment during the relevant time period; that the government retained

some but not all of the video surveillance footage from this period; that the additional footage is

now no longer available; that the government has no justification for failing to retain this footage;

and that this now unavailable footage contained exculpatory evidence, Mr. Louis brings a

spoliation motion asking the Court to dismiss the indictment or alternatively to provide an adverse

jury instruction at trial to cure this due process violation.  Separately, Mr. Louis moves to dismiss

the indictment on Second Amendment grounds following the Supreme Court's decision in *Bruen*.

### III.    Law & Analysis

   a.   <u>The Court should Dismiss the Indictment or Alternatively Provide an Adverse Jury Instruction Due to the Government's Failure to Preserve Exculpatory Evidence.</u>

This Court must impose sanctions for the government's spoliation of exculpatory video

evidence.  Spoliation is defined as "the destruction or significant alteration of evidence, or failure

to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 706 (S.D.N.Y. 2017) (quoting *In re Terrorist Bombings*

*of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008)) (internal quotations omitted).  "A

party seeking sanctions for spoliation has the burden of establishing the elements of a spoliation

claim."  *Id.*  (citation omitted).  In a criminal case, the defendant must, as a starting place, establish

that the government had an obligation to preserve the now unavailable evidence.  *See United States*

*v. Rahman*, 189 F.3d 88, 139 (2d Cir. 1999) ("[T]he record must first show that evidence has been lost and that this loss is chargeable to the state."). Additionally, where dismissal is sought, the defendant must show: "(1) that the evidence possessed exculpatory value that was apparent before it was destroyed; (2) that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) bad faith on the part of the [g]overnment." *United States v. Walker*, 974 F.3d 193, 208 (2d Cir. 2020) (citation omitted).

Ultimately, the remedy for a spoliation claim is left to the "sound discretion of the district court." *Tchatat*, 249 F. Supp. 3d at 706 (citation omitted). "Any sanction imposed by a court should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* (internal quotations and citation omitted).

Here, the government's deliberate failure to preserve exculpatory video evidence warrants dismissal of the indictment. As a threshold matter, the loss of the video surveillance footage from outside of apartment #4G is undoubtedly chargeable to the government. While the government has no obligation to conduct an investigation on the defense's behalf, this is not a situation where the government was unaware of the existence of this footage or simply decided not to pursue this footage altogether. To the contrary, the government was both aware of the footage's existence and aware of the relevant nature of the footage, which is corroborated by the fact that the government obtained and preserved a small subset of this footage. Make no mistake, when the government directed the apartment building's representative to pull two dozen short video clips off of the apartment's video surveillance system from the period of September 27, 2025 through October 10, 2025, this placed entirety of that footage from this time period in the government's constructive

9

possession.  Indeed, the government exercised control over the footage through that representative. *See United States v. Albarran*, 943 F.3d 106, 118 (2d Cir. 2019) (defining constructive possession as a situation where an individual "knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others").  Hence, by failing to preserve the entirety of this footage, which has now been overwritten, the government became responsible for its loss.  *See, e.g.*, *Gaston v. Hazeltine*, 2023 WL 3276001, at \*10 (N.D. Ind. May 4, 2023) ("Accordingly, because Grange had constructive possession over the lighting system, knew of the likelihood of the litigation, knew of the importance of the lighting system, and had a financial motive to destroy the evidence, it (and its agents acting on its behalf) had a duty to exercise reasonable care in preserving the lights when testing them[.]").

In addition to the loss being chargeable to the government, Mr. Louis can establish that the lost surveillance footage contained exculpatory evidence, that comparable evidence is not reasonably available to him, and that the government's failure to preserve this evidence was the product of bad faith.  *See Walker*, 974 F.3d at 208 (Where dismissal is sought, the defendant must show: "(1) that the evidence possessed exculpatory value that was apparent before it was destroyed; (2) that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) bad faith on the part of the [g]overnment.").  First, the exculpatory nature of the evidence is apparent on its face.  At trial, the government will argue that Mr. Louis had constructive possession of the firearms found in that apartment.  Hence, if there is evidence establishing that someone other than Mr. Louis had access to the apartment or, even better, that someone other than Mr. Louis transported those firearms into the apartment, then this would allow the defense to credibly argue that Mr. Louis did not exercise dominion and control over those firearms, but instead, argue that these firearms were possessed by

someone else. *See United States v. Prawl*, 149 F. 4th 176, 183 (2d Cir. 2025) (finding a defendant's mere presence at a location where firearms are found is not sufficient to establish constructive possession).

Here, the government knew that *at least* three people other than Mr. Louis accessed the apartment between September 27, 2025 and October 10, 2025. Indeed, in one short clip from October 3, 2025, we see the backside of an unidentified man leaving the apartment while carrying multiple duffel bags.



The government also knew that the building superintendent and a locksmith accessed the apartment prior to officers arriving at the apartment building on October 10, 2025. Therefore, video footage of these three people entering the apartment would constitute exculpatory evidence because it establishes that individuals other than Mr. Louis had the ability to enter the apartment, and thus, leave items inside. On this basis alone, Mr. Louis has satisfied the first prong of a spoliation claim. *See Walker*, 974 F.3d at 208 (where dismissal is sought, the defendant must show "that the evidence possessed exculpatory value that was apparent before it was destroyed").

But importantly, this does not even account for the potential exculpatory evidence contained in the video footage that we no longer have access to due to the government's failure to preserve such footage. For example, the footage may show others entering and exiting the

11

apartment during the relevant time period.  Or even better, the footage may show one of the three individuals that we know entered the apartment (or others) either carrying items that resemble firearms or a bag similar to the one where several firearms were later found.



Given that we know of at least three examples of individuals accessing the apartment independently of Mr. Louis, it is not speculative to assume that there were others captured on the now unavailable video.  Mr. Louis has therefore demonstrated not only that the unavailable footage has actual exculpatory value, but that it also has additional potential exculpatory value that is not speculative in nature.  *See Taylor v. City of New York*, 293 F.R.D. 601, 613 (S.D.N.Y. 2013) ("A moving party can carry its burden and make [s]uch a showing . . . by pointing to extrinsic evidence tending to demonstrate that the missing evidence would have been favorable to the movant.  This burden notwithstanding, a court must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would . . . allow parties who have destroyed evidence to profit from that destruction.").

Turning next to whether the now unavailable evidence is such that Mr. Louis would be unable to obtain comparable evidence by reasonable means, it is clear that Mr. Louis is without any other recourse.  To begin, by the time Mr. Louis was arrested and undersigned counsel was

appointed to represent him on December 3, 2025, the apartment footage from September 27, 2025 through October 10, 2025 would have no longer been available. Indeed, as set forth in Amir Barkhordar's sworn affirmation, the apartment building's video surveillance system only retains footage for a period of 30 days. *See* Exhibit 1. Accordingly, Mr. Louis' inability to obtain this footage now cannot be attributed to a lack of diligence on his part.

Additionally, the fact that video exists of one other person leaving the apartment on October 3, 2025 does not cure the fact that the government failed to preserve the video of this individual entering the apartment at an earlier time. For one, the defense is prevented from identifying this individual since his face is not visible in the video. Had the video of this individual entering the apartment been preserved, the defense would have seen his face as he approached the apartment, possibly been able to identify him, and thus, been able to interview this individual as a potential witness. Furthermore, video of this individual entering the apartment could have established whether he entered the apartment carrying items resembling a firearm or entered the apartment carrying a bag similar to the one where firearms were later found. All of this could have been used to support the defense theory that someone other than Mr. Louis possessed the firearms found in that apartment.

Moreover, we have no video showing the building superintendent and locksmith entering the apartment prior to police arriving on the scene. While the government may argue that Mr. Louis can establish that these individuals entered the apartment through testimony, such testimony would not carry the same weight as video evidence. Video evidence is one of the most powerful forms of evidence because it leaves nothing open to interpretation or fabrication. The video, for instance, could have established how long these individuals were in the apartment unsupervised

and whether they carried anything into the apartment that was not there before.  This is critical evidence that the defense could have used to create reasonable doubt.

Finally, and most critically, without the full video surveillance, the defense is prevented from establishing whether other people entered the apartment during this relevant time period. Indeed, there is no building sign-in log or doorman that we could subpoena in the alternative.  Mr. Louis is thus left with no reasonable access to comparable evidence.  Although the government may argue that the evidence Mr. Louis seeks is predicated on speculation, it is not speculative when we already have proof that at least three people entered that apartment.  Any speculation beyond this was created by the government's own failure to preserve clearly relevant and exculpatory evidence.  Mr. Louis has met his burden on this second prong of his spoliation claim. *See Walker*, 974 F.3d at 208 (where dismissal is sought, the defendant must also show "that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means").

Turning lastly to whether there was bad faith on the part of the government, courts have held that "the government's failure to retain potentially exculpatory evidence is done in bad faith when the circumstances under which the evidence is discarded negate any innocent explanation for the government's conduct." *United States v. Soriano*, 401 F. Supp. 3d 396, 401 (E.D.N.Y. 2019).  Here, there is no explanation for why the government failed to preserve all video surveillance footage from the periods between September 27, 2025 and October 10, 2025, despite, as discussed above, being placed on notice about its exculpatory nature.  Importantly, this is not a case where the government preserved zero footage from this time period.  Rather, the government preserved two dozen short video clips from this time period because it was aware of its relevance to this case.  *Cf. United States v. Cesiro*, 2024 WL 4647667, at *2 (2d Cir. Nov. 1, 2024)

14

("Detective Smith attested that he chose not to preserve information relating to his interactions with other FetLife users, as well as his membership in certain groups on the platform, because he did not find this information to be relevant to the investigation involving [the defendant].").  The government, however, chose primarily to preserve the footage that advanced its narrative of the case: that Mr. Louis was responsible for the firearms found in the apartment  This selective preservation was not merely an oversight.  Instead, it was a dereliction of duty.

To the extent the government attempts to argue it was unaware that the apartment's video surveillance footage would later be destroyed, or that it believed no additional footage was available because of the mistaken understanding that the apartment's surveillance system only captured and saved video when it sensed movement, neither of these explanations should be accepted.  It is common knowledge that video surveillance footage is not saved indefinitely.  Indeed, that is exactly why the government did in fact request and preserve some of the footage from the relevant time period.  Furthermore, even if the government genuinely believed the apartment's video surveillance system only captured and saved video when the cameras sensed movement, this does not explain why we have no footage of the unidentified male seen leaving the apartment on October 3, 2025 actually entering that apartment at an earlier period in time.  Nor does it explain why we have no footage of the building superintendent and locksmith entering the apartment alone on October 10, 2025, or footage showing the individual alleged to be "Louis" approach apartment #4G and then flee from officers that same day.

In short, the loss of the apartment's video surveillance footage in this case is chargeable to the government, its exculpatory value was readily apparent, the government is without explanation for its destruction, and Mr. Louis is now left without recourse.  This missing footage is not only material to Mr. Louis' defense, since it would establish that others had independent access to the

15

apartment, but it could also be his only defense.  Under these circumstances, dismissal of the indictment is warranted.  *See Soriano*, 401 F. Supp. 3d at 404 (finding dismissal warranted where "[t]he evidence the Government destroyed was not just something that might be expected to play a significant role in [the defendant's] defense . . . [i]t was [the defendant's] entire defense").

Notwithstanding the above, even if outright dismissal is not warranted, the Court must, at the very least, provide an adverse jury instruction to cure the government's due process violation. *See Dorchester Financial Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) (listing the possible remedies for a spoliation violation to include "further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal").  Short of dismissal, the Court should instruct the jury as follows:

> The government failed to preserve relevant video surveillance footage captured outside the door of apartment #4G from the period of September 27, 2025 to October 10, 2025.  This footage would have shown that other individuals besides Mr. Louis had access to the apartment, and did independently access the apartment during this time period.  You may consider the government's failure to preserve this footage and draw whatever adverse inferences that you deem appropriate.

Only by imposing significant sanctions will the government be deterred from future due process violations, and will Mr. Louis be restored from the prejudice that he otherwise now faces. Accordingly, the Court should grant Mr. Louis' motion to dismiss the indictment or alternatively to provide an adverse jury instruction.

  b. <u>The Court should Dismiss the Indictment because the Second Amendment Protects Mr. Louis' Right to Possess a Firearm.</u>

Undersigned counsel is aware of the Second Circuit's decision in *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025), holding that 18 U.S.C. § 922(g)(1) is constitutional both facially and as applied to prior felons.  Nevertheless, for preservation purposes, we submit this motion to dismiss

the indictment on the ground that § 922(g)(1) violates the Second Amendment, as interpreted in *Bruen*, both on its face and as applied to Mr. Louis, a member of "the people" protected by the Second Amendment.   A lifelong, categorical ban on possessing a firearm and ammunition following any felony conviction unconstitutionally infringes the Second Amendment and Mr. Louis' Second Amendment rights because it is not consistent with this Nation's historical tradition of firearms regulation.

## IV.    Conclusion

For all of the reasons stated herein, Mr. Louis respectfully moves the Court for an order granting his motion to dismiss (on two separate grounds) or alternatively to provide an adverse jury instruction.

Dated: April 8, 2026

Respectfully Submitted,

*/s/*＿＿＿＿＿＿＿＿＿＿＿

**Kristoff I. Williams**
Assistant Federal Defender
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212)-417-8791

17